May it please the Court, my name is Corey Hurwitz and I represent Appellant A.S.A. Produce Company, Inc. I'd ask for five minutes to be reserved for rebuttal. Just keep track of the time. We're here today to attempt to reverse the District Court's granting of defendants, or Appellee's, motion for summary judgment. There's really two main issues on why reversal is justified. The first one is the procedural issue, the violation of Federal Rule of Civil Procedure 56D. Everest did not meet their burden in bringing forth their motion for summary judgment, as they failed to adjudicate each claim under 56D. The Court recognized this. Didn't they say there's no evidence to support the plaintiff's claim? The District Court did say that, Your Honor, but as this Court found... No, I'm saying in their opposition, or in support of their motion. Didn't they assert there is no evidence? They concentrated solely on the bad faith claim. Right, to support the contract claim, though. The breach of contract claim was not mentioned at all. I thought it was kind of a cursory, just there's no evidence to support the claim. That is true, Your Honor. They did mention that, you know, there is no evidence. Right. But in reality... Well, isn't that enough? It's not enough, Your Honor. Under Fair Housing, this Court found that each motion and each cross-motion must be looked at separately. Simply by ASA bringing forth a cross-motion for summary judgment, it cannot serve to... Well, we have case law. I mean, if the District Court does it correctly, that if, you know, there's a motion for summary judgment and the other side does not file a cross-motion for summary judgment, but the District Court determines that the moving party's motion for summary judgment should not be granted, but then, in fact, the law requires that judgment be entered for the non-moving party, the District Court can do that. You're right, Your Honor. However, the District Court here did not use their sua sponte powers. Instead, they used plaintiff's own cross-motion in order to cure the defects, in order to fix the mistakes of Everest's moving papers. Besides, even if the Court were to grant it, use its own sua sponte powers, it requires full notice and an opportunity to be heard from ASA. Here, this didn't happen. There was no oral argument here. ASA had absolutely no idea this was going to happen. This came as a complete shock to them. ASA brought this argument in each of its three submitted papers. It was the very first paragraph. And Everest failed to respond at all to that procedural defect argument. Here, due process requires that the District Court grant ASA the opportunity to be heard on this issue. Had oral argument been made, perhaps things might have been different. The other reason why reversal is justified is the substantive arguments. Here, the undisputed facts require a finding that ASA's motion for summary judgment has much more justification than Everest. However, in the hopes of simply just putting this back down to a jury, we would ask the Court for reversal because there are numerous tribal issues. The first and primary one is the failure to investigate. And as this Court found in Amedeo and the California Supreme Court found in Wilson, both require a finding that there is a thorough investigation before you even start talking about the genuine dispute doctrine. And here, there are probably a dozen red flags on why this claim was either fraudulent or completely made up. Isn't there a provision in the policy that required the insured to notify the insurance company? I believe there was, Your Honor. That they believed that, you know, to raise the possibility of fraud. I believe there is, Your Honor. So is there any evidence here that that happened? There is. Before the case was settled? There is, Your Honor. There are two declarations from ASA employees contacting, telephoning Everest and saying, this claim is fraudulent. Verdine is lying. Come talk to us. Come talk to us. Come investigate. Come talk to the supervisors. You know, Virginia Martinez and Mr. Moesi both saw Mr. Verdine on a daily basis bending, moving. He didn't look injured. And they submitted these in declarations and they informed Everest at the time the claim was ongoing. It's not like ASA was sitting back and just hoping that Everest would take care of him. No. ASA was proactively complaining about this claim. This post-termination claim. This claim where Mr. Verdine never complained about an injury to his employers, to his employees, or even sought treatment until after he quit. Twelve days later, he goes and talks to an attorney. The attorney sends him over to a workers' comp doctor and the system began. And unfortunately, ASA is caught up in the system. And ASA was hurt by their modification factor tripling and their premiums tripling. And we're not talking about $5,000, $10,000 here, Your Honors. We're talking about $148,000. Having a higher modification factor is like a scarlet letter on your chest. You can't just go out like car insurance and find the cheapest car insurance. No. You come around and there's only a limited number of work comp insurance carriers. And if you have a mod factor that's higher than most, all of a sudden, you're going to have much higher premiums. So what's the theory for your breach of contract claim? There is an express provision in the contract that says, we will defend. Now, the word defend is pretty vague. But here, it's the average insured, what they believe what that really means. And then I believe an average insured would think, you know what? When I see we will defend in a contract, that means they're going to protect us. That means they're going to investigate. That means they're going to do what's required. So what you're saying, though, is not that they didn't investigate, but they didn't do enough of an investigation. I would argue that their investigation Is that right? Well, I would argue that their investigation was almost zero, was basically, it was so perfunctory, it was so superficial, that doesn't even justify an investigation. And yet they settled. I'm sorry? And yet they settled. And yet they settled. And the reason why they settled, it's quite obvious, is that they simply just raised up the mod factor. The premiums come right back to them. They did benefit by paying this claim, because they knew that the money, the premiums would just come right back from ASA. It's not like ASA is not an evil organization. I mean, I don't know, but, I'm sorry, Everest is not an evil organization. I don't know, but the fact is that Everest had the opportunity to protect ASA, and they settled this claim. Did Everest send him out for, part of an investigation would be, I gather, to send out and get a medical evaluation, a sort of an independent evaluation? Yes, Your Honor. Did they do that here? Everest not only sought out one doctor, but they sought three doctors. They sought out a neurologist, a psychiatrist, an orthopedist. All three of these doctors found no disability, no compensable injury. And, in fact, one doctor, Gerard Paul, found that he believed the claim was completely frivolous, that there was nothing wrong with Mr. Verdeen. But despite the fact that these three doctors that Everest paid for, that they counted on their opinions on, they just settled the claim anyway. Now, was there other medical evidence that was in play? There was, Your Honor. A state comp insurance fund was joined as a co-defendant, and SCIF, they hired their own medical doctors to evaluate Mr. Verdeen. They hired a psychiatrist and an orthopedist who also found no compensable injury, no disability, no problem. So now you have a total of five doctors, five doctors, that Everest and SCIF paid for in order to evaluate Mr. Verdeen, and none found any injury. None found anything wrong with Mr. Verdeen. And that begs the question of why hire? Did the five doctors fix a fair damage figure? Did the defense doctors? Yeah. The defense doctors found no compensable injury. They found nothing wrong with him. So that begs the question of why would Everest hire these defense doctors? So only to find out that there's nothing wrong with him. Somebody took Mr. Verdeen, is that it? Yes. Took his deposition, correct? Someone did take his deposition, Your Honor. Everest did hire a work comp defense law firm, and they did depose him. And the lawyer also had Verdeen's own lawyer's medical records that they produced. They did, Your Honor. And Everest knows. And in the record in front of you, you'll see that Everest knew that they had applicants' doctor reports, and they also had the defense doctors' reports. And they even mentioned in their own records that our doctors found no compensable injury, no disability, no problem here. I see I'm running out of time here, so I'll reserve my time for rebuttal. Thank you. May it please the Court? My name is Robert Cooper, and I represent Everest National Insurance Company. The most disturbing aspect of this lawsuit is that an insured is suing an insurance company claiming that the insurance company committed bad faith by paying the claim. As I'm sure Your Honors are fully aware, the typical case involves a denial of a claim where the insured sues. Keep your voice up, please. Sure. The typical case involves the denial of a claim where the insured claims that the insurance company committed bad faith by denying a claim. Here we have the opposite situation. First, I'd like to address the procedural issue, and then I'd like to address the substantive issues that counsel addressed with respect to the bad faith and breach of contract claims. The underlying facts that gave rise to this bad faith lawsuit are undisputed. The only dispute is regarding the proper interpretation of the underlying facts that gave rise to this case. That in and of itself creates this case as the best candidate for an MSJ, to get rid of this case at the summary judgment stage as opposed to sending it to a trial. For example, as the trial court noted on page 16 of the excerpts, ASA had listed 44 undisputed facts in support of its own MSJ, and then they copied and pasted the same identical facts verbatim, claiming that they were disputed in order to oppose our summary judgment motion. The judge saw that and she said that, obviously, that raised serious credibility issues in terms of their position as to whether MSJ is a proper procedure to handle this lawsuit. Now, with regards to the substantive issues, it's undisputed that the workers' compensation judge reviewed everything that was presented by both sides in the underlying case, and having done so, he specifically said that, I find their settlement to be reasonable. I believe, having reviewed the entire record, the workers' compensation specifically said, I believe that this is a fair settlement, this is a reasonable settlement. So here we have a judicial officer essentially blessing the settlement. It's not a situation where you have a paper pusher at a claims department, you know, unilaterally deciding to pay a claim. We have a judicial officer blessing the settlement. In addition, the record also shows that it was ASA's own attorney that repeatedly asked Everest to not only defend, but also to indemnify. So we did. We complied with their request that we indemnify ASA. Otherwise, they would have sued us, saying, you're not defending, you're not indemnifying. Now, in addition to the attorney, ASA's own broker recommended settlement. That's on page 42 of the supplemental excerpts. The broker mentioned that I have received some sort of verbal representation from the insured, disputing, you know, the validity of the claim, but based on my prior experience as a workers' compensation broker, it's, you know, the insured's typically confused how the workers' compensation system works, so go ahead and pay it. It's a, you know, the offer that was made is a reasonable offer, and we would like you to settle. So we did. Again, so we have the attorney recommending, not recommending, but requesting indemnity. We have the broker recommending settlement, and then we have the judicial officer confirming the reasonableness of the settlement. What did the insured say prior to the settlement? Nothing in writing. Labor Code section 3761 expressly requires the insured to object to raise any questions regarding, you know, these types of settlements. Well, was the settlement offer tendered to the defendant and rejected? To the insured? Yeah. No, there's a settlement. Did the defendant, I mean the plaintiff, the insured party reject the settlement? No, there have been multiple offers going back and forth between the insured party and the defense counsel that was defending ASA. And they finally agreed upon a settlement of $35,000, which was only 70 percent of the recommended amount. In other words, the defense attorney managed to pay much less than the authorized amount. Once again, demonstrating that Everest was going out of its way to make sure that it doesn't pay more. Was ASA advised that the case was going to settle? You mean before settlement was executed? Before it was presented to the judge. We've settled this case, and we're going to present it to the judge. The communications were with the broker, who was their representative. So to the extent that they're claiming that the broker failed to communicate to them what was going on, I suppose they could sue the broker. But, you know, the broker they had was a specialist in workers' compensation laws. Well, the broker did send a letter about two years late saying that there was a question about the bona fides of this claim. Correct. There was a letter that was sent in October 2004, I believe. That was a letter by the attorney. The attorney objecting, saying... Well, October, that was after the settlement was all backed up and gone. Exactly. Now, this case is really about the collateral damage to the employer because of their future workers' compensation costs. And I assume that both sides are sophisticated. Both sides knew that there would be collateral damage if the settlement was unwise and inappropriate. Absolutely. We're dealing with an insured who, by their own claims, has, you know, pays hundreds of thousands of dollars to their independent contractors. We're not dealing with, you know, an old person who buys life insurance or car insurance and who doesn't get the coverage that they get. We're dealing with a sophisticated... I was wondering if somebody was sort of sleeping through part of this business and missed an opportunity to squawk early. It seems like ASA knew something... Absolutely. ...was going on here and didn't... Absolutely. ...didn't raise the question until after it was over. Exactly. That's what's so disturbing about this lawsuit. But I think the other big picture ramifications of, you know, accepting the other side's arguments is that it totally destroys the whole public policy of encouraging insurance companies to settle. And specifically for workers' comp carriers, that's a very dangerous proposition that plaintiffs are essentially advocating because there are certain factors that are unique to these workers' compensation cases that should be taken into account. Number one, when you're dealing with an injured employee, you know, a lot of times you have a situation where they're experiencing pain. Pain, by definition, is a very subjective issue, and you can't really identify that in an MRI. So if the employee comes in and claims that he has pain and his own treating physicians repeatedly confirm, you know, the fact that he has had medical issues, then it's not enough to say, well, you should have agreed with the other doctor who said otherwise. You're dealing with something that's not objectively verifiable. You're dealing, you know, you're dealing with employees who may otherwise lack health insurance. So to the extent that workers' compensation benefits are denied... If they don't settle, if the employer, if the workers' comp fund doesn't settle, the insurance company doesn't settle, what's the potential risk? Well, as we indicated on page 18 of our brief, there are several statutory penalties and ramifications in terms of statutory penalties, interest, attorney's fees that ASA would have been exposed to by which they would have simply asked us to pay. How about on the award, the award amount? The dollar amounts could be, the workers' compensation judge has the power to increase the dollar amount. And there are several statutes. It's a pretty complicated system. I try to summarize it as best as I can on page 18 of my brief regarding all those technical workers' compensation statutes and penalties that kick in for violating the code and unnecessarily or unreasonably delaying payment. Now, with regards to the issue of the genuine dispute doctrine, I think the most significant feature of this affirmative defense is that the court doesn't get, the court doesn't sit here today and decide whether we made the right decision or whether ASA was correct. The only issue for the court is whether there was in fact a legitimate dispute. And I think given the wide gap between the amount of money that they're saying that the injured person, you know, Mr. Verdin should have been paid, which they say is zero, and the amount of money that we believe is reasonable, which is about $116,000, that gap in and of itself confirms that there was a legitimate dispute. And the Rappaport-Scott case that we cited illustrates that. In that case, you had a situation where the arbitrator issued an award for about $60,000, but the insured was claiming that she was entitled to about $340,000. And the court of appeal dismissed the bad faith lawsuit at the demurred stage, saying, well, there was such a huge gap that as a matter of law, that shows that there was a genuine dispute. And you have the same situation here. They're saying that the person should have received only, you know, zero amounts in terms of benefits. The defense counsel recommended settlement of up to $150,000. It was ultimately settled for only about $116,000. So that six-figure gap in and of itself, I think, shows the existence of a legitimate dispute here. And does that doctrine apply to the breach of contract claim? They never made that argument, so I never addressed it. I have seen cases that say that the genuine dispute is limited to the bad faith claim. But since they never raised that argument, obviously, I would think it's too late for them to make that argument. So the district court, Sue Esponte, granted summary judgment on the contract claim. Is that right? Well, she, as the district court indicated, in our MSJ notice, the attorney, the former attorney who handled the MSJ, specifically referenced, and I'm quoting here, that he was seeking, you know, MSJ, quote, as to each cause of action. The phrase, each cause of action, it's a quote from page SCR 132, line 2. So to the extent that they're claiming that they're surprised by the judge giving us MSJ on the breach of contract claim, I think the record refutes that allegation. And obviously, they had ample opportunity to respond. In fact, they had three sets of briefing, as counsel just conceded. You know, the judge, they did their own MSJ on the breach of contract action. They presented their own evidence, their own undisputed fact. So I just can't see how they can claim to have been surprised by our dismissal on that cause of action. And finally, they never requested oral argument. So it's too late for them to say that the judge made a mistake by, you know,  Unless the court has any other questions, I would submit. Thank you. Thank you. I'll first address counsel's statement regarding how rare this type of bad faith case is by paying a claim. As ASA mentioned in their opening brief and reply brief, California courts have repeatedly allowed for these types of cases where it affects an employer's future premiums. And I'll reference Notreika, Tricor, Lance Camper, security officers. It's really the underlying conduct and not the increased premiums that gives rise to the tort of bad faith. Well, I had a question about the first notice that ASA had that this case might be questionable. It was as early as, I think, February of 2003. Dr. Rubenstein said he thought there wasn't any cause here, any industrial accident. Then a year goes by. And in April of 04, somebody, ASA's broker wrote and said they thought the claim was possibly spurious. What happened during that year? What were people doing that caused all this time to go by before ASA started to get nervous about this claim? Well, Your Honor, as the declarations of Ms. Martinez and Mr. Moesi state, they were calling Everest. They were trying to find out what the status was. They were leaving messages. They weren't getting any response. They were trying to find out what was going on. And a company like ASA, which is a produce market, one of their biggest priorities is selling produce. When it comes to a work comp claim where they're getting notices periodically every few months from defense counsel, it's one of these things where they're left kind of in the dark. And until they found out, and I'm glad you asked the appellee's attorney if ASA ever found out about the settlement. The answer is no. They never received word that there was going to be a settlement. Had they, things might be a little bit different. Maybe they would have gotten an opportunity to be heard at the workers' comp compromise and release hearing. Well, a state commission denied the claim in September, wasn't it, of 03? They did, Your Honor. So did they know about that? Did ASA know about that? That I'm not entirely sure about, Your Honor. Did they sleep through it? Well, I wouldn't say they slept through it, Your Honor. If anyone were to have slept through this, quote, investigation, it would have been Everest. And the reason why is we have an e-mail from Andrew Sinko from Everest asking for, we haven't received any information for five months. Basically, this claim is sitting around. What's going on? We have no plan of action. We have no attorney summaries. We have nothing. Can you please give me a status? They're begging for it because Everest, through ACCA, their third-party administrator, they were the ones that were sleeping through this. They were not paying any attention to their own defense doctor's quite clear medical reports that says there's no injury. Well, the smoking gun was probably either the lawyer or the claims person for ACCA who said this guy will make a pretty good witness. Well, Your Honor. That may be the place where they started thinking about settlement and getting rid of the case and all this. I would invite you to read some of the portions of the deposition of Mr. Verdeen where he talks about his injuries and how vague he is about them. He does testify to two injuries, but come on. They don't even sound credible at all. I kind of don't know what defense counsel was thinking during this case when he mentioned that Mr. Verdeen would make a good witness. It sure didn't seem like it to me. It sure seemed like Mr. Verdeen was going through the motions. Well, these insurance companies get a little gun shy about bad faith refusal to settle, so it causes maybe an overreaction sometimes, but they start evaluating how this witness has a face like an affidavit and the jury will love him and so on, and they talk like that about all this stuff. Meanwhile, the damage is being done. The innocent people out there don't know anything about what's going on in these discussions. You raise an interesting point, Your Honor. Insurance companies should be scared of bad faith. And a case like this is a perfect example where they need to meet their obligations to investigate. They need to do a thorough job. And as this court found in Armondale, they failed to do that. Okay. Thank you for your time. Thank you very much. And ASA Produce v. Everest National is submitted. We appreciate your argument. We're going to submit the case we passed over, second case. Which one? Callous? Yeah. Computer Associates. Wasn't argued. Callous, the one that is coming last. Oh, where's that one? When are we going to hear it? Last. Oh, all right. Okay. Heinemann? We're going to hear Heinemann first. Does anybody hear from the? On that other case, on Callous v. Holder, is anybody here representing the petitioner? You're here. Okay. We weren't sure, so we just put it at the end of the calendar.
judges: Goodwin, Beezer, Paez